COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judge AtLee and Senior Judge Humphreys
Argued at Williamsburg, Virginia


TIRAN LYNDELL WILSON

                                                MEMORANDUM OPINION* BY
v.        Record No. 1232-24-1            CHIEF JUDGE MARLA GRAFF DECKER
                                                   JANUARY 13, 2026
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Mary Jane Hall, Judge

J. Barry McCracken, Assistant Public Defender, for appellant.

Brooke I. Hettig, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Tiran Lyndell Wilson appeals his conviction for second-degree murder in violation of

Code § 18.2-32.  He argues that the trial court erred by denying his post-jury-empanelment

motion for a competency evaluation, admitting the contents of two 911 calls, and concluding the

evidence was sufficient to prove that he was the person who committed the murder.  We hold the

trial court did not err and affirm Wilson's conviction.

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

On September 2, 2022, Marcos Mata-Monjaras and his wife, Maria Mercedes Mata (Mercedes), were vacationing in Norfolk's Ocean View area. That evening, Mata-Monjaras and Mercedes spent time on the beach. As they prepared to return to their hotel, Mercedes walked ahead of her husband and noticed a man standing twenty to thirty feet away with his hand behind his back. Later, at trial, she identified Wilson as that man. Wilson and Mata-Monjaras spoke briefly about fishing as Mercedes walked past the man. Seconds later, when Mercedes heard her husband call her name, she looked back and saw him bleeding profusely from his chest. She also saw Wilson "fleeing." Mercedes tried unsuccessfully to call 911 and then ran to the hotel for help. When police arrived in response to a 911 call from the hotel, Mata-Monjaras was dead.

Hotel staff familiar with Wilson encountered him on hotel property twice on the day of Mata-Monjaras's stabbing death. Employee James Triba contemporaneously reported Wilson's presence on the property several hours before the stabbing, both notifying the hotel's general manager, Kalyn Taylor, and calling 911.

Later that night, shortly before the stabbing, hotel employee Mequel Hickson also saw Wilson. Knowing Wilson had been banned from the property, Hickson told him to leave. He noticed that Wilson was wearing gardening gloves and holding a "big butcher knife" or "machete," so Hickson radioed the front desk. When Wilson walked away, in the general

---

[1] We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). In doing so, we "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences [that can] be drawn [from the evidence]." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018) (per curiam)). "This deferential principle applies not only to 'matters of witness credibility' but also to the factfinder's 'interpretation of all of the evidence, including video evidence' presented at trial." *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022)).

direction of the hotel and the beach, Hickson followed him from a distance and called 911.[2]

While Hickson was on the phone, he saw Tabatha Fitzgerald, the front desk clerk he had just radioed, confront Wilson in the parking lot. She asked him if he was staying at the hotel. Wilson cursed at her and kept walking. He went "through the breezeway," and Hickson lost sight of him. Shortly after, a woman "started screaming down by the beach" and then ran to the hotel. When police arrived minutes later, they found Mata-Monjaras dead.

Using witness descriptions, Norfolk police subsequently located, detained, and interviewed Wilson.[3] He identified himself in photographs made from hotel surveillance video recordings, both from the evening of the stabbing and earlier that day. He denied that the object in his hand in some of the later photos was a knife, claiming instead that it was a key chain. Wilson admitted his familiarity with the hotel's layout, saying he lived nearby and "like[d] going there."

Triba and Hickson testified at trial, as did Taylor. All identified Wilson as the person they had seen on the property at various times on the day of the stabbing. Hickson testified that Wilson was the person he saw carrying a knife and wearing gardening gloves just before the stabbing, and he identified gloves in photographs introduced by the Commonwealth as similar to the ones Wilson wore. Taylor explained that Wilson had "been told to leave" the hotel's property more than five times before. She pointed Wilson out in eleven video recordings played for the jury that showed him on hotel property the day and evening of the stabbing. Taylor identified Wilson "with a knife, a machete[,] behind his back" in four of the recordings.

---

[2] The recordings of Triba's and Hickson's 911 calls were played for the jury.

[3] When police searched Wilson's apartment, they found clothing similar to the witnesses' descriptions of the perpetrator's clothing and the clothing seen in the videos. They also recovered a gardening glove.

Doctor Wendy Gunther, an assistant chief medical examiner, conducted the autopsy of Mata-Monjaras. Gunther opined that he died from "a large stab wound" inflicted with a knife plunged into his chest "up to the hilt." She concluded that the murder weapon was a "kitchen knife," with "a blunt side and a sharp side."

The jury convicted Wilson of second-degree murder, and he was sentenced to forty years in prison.

ANALYSIS

I. Competency for Trial

Wilson challenges the trial court's denial of the motion for a competency evaluation made by defense counsel on the morning of trial after the jury had been sworn.

"Because a trial court is in the best position to weigh the evidence presented on a defendant's competency, [the appellate court] will reverse a trial court's decision denying a competency evaluation under Code § 19.2-169.1(A) only if th[at] court abused its discretion." *Clark v. Commonwealth*, 73 Va. App. 695, 705 (2021). "This bell-shaped curve of reasonability governing our appellate review rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Commonwealth v. Barney*, 302 Va. 84, 94 (2023) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). An abuse of discretion occurs only when "'reasonable jurists could not differ' as to the proper result." *Clark*, 73 Va. App. at 705 (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). And the factual findings underpinning a competency ruling, including credibility determinations, "will not be disturbed on appeal unless plainly wrong." *Dang v. Commonwealth*, 287 Va. 132, 146 (2014); *see Grattan*, 278 Va. at 617.

In the trial court, establishing incompetence presents "a high burden." *Johnson v. Commonwealth*, 53 Va. App. 79, 92 n.2 (2008). "[T]he party asserting incompetency . . . [must]

- 4 -

prov[e it] by a preponderance of the evidence." *Stewart v. Commonwealth*, 79 Va. App. 79, 87 (2023) (first alteration in original) (quoting *Grattan*, 278 Va. at 616); *see* Code § 19.2-169.1(E).

Competency for legal purposes is well defined. "A defendant is competent to stand trial when he has the present ability to understand the proceedings against him and consult with his lawyer with a reasonable degree of understanding." *Clark*, 73 Va. App. at 704-05; *see id.* at 706-07 (recognizing that competency is a federal constitutional requirement for criminal prosecution). Because "'no fixed or immutable signs . . . indicate the need for further inquiry to determine fitness to proceed,'" the decision to order a competency evaluation is "factually intensive." *Johnson*, 53 Va. App. at 92 (quoting *Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

More specifically, "a court is required to order a competency evaluation if there is 'probable cause to believe' the defendant 'lacks substantial capacity to understand the proceedings against him *or* to assist his attorney in his own defense.'" *Clark*, 73 Va. App. at 706 (quoting Code § 19.2-169.1(A) (emphasis added)); *see also* Code § 19.2-169.1(A) (acknowledging that a court can order a competency evaluation "at any time after the attorney for the defendant has been retained or appointed and before the end of trial"); *Drope*, 420 U.S. at 181 ("Even when a defendant is competent at the commencement of his trial, a court must always be alert to circumstances suggesting a change that would render the accused . . . [in]competen[t for] trial."). Whether probable cause exists "depends on 'probabilities that are based upon the factual and practical considerations in everyday life as perceived by reasonable and prudent persons.'" *Clark*, 73 Va. App. at 707 (quoting *Johnson*, 53 Va. App. at 93).

An attorney's opinion of a client's competency is a "persuasive factor" that a trial court "should 'strongly consider'" because counsel "is in the best position to speak to a client's ability to understand proceedings and assist counsel at trial." *Id.* at 708 (quoting *Johnson*, 53 Va. App. at 94). Consequently, in certain circumstances, "courts have found counsel's *detailed proffer*

about a client's mental state sufficient to satisfy the probable cause standard." *Id.* (emphasis added). Even so, "counsel's assertions, 'standing alone, do not *typically* provide probable cause for an evaluation.'" *Id.* (emphasis added) (quoting *Johnson*, 53 Va. App. at 94). "[A] judge most often evaluates several relevant factors to determine if a[ competency] evaluation is warranted . . . ." *Id.*

Additional evidence can include "expert testimony or layperson observations." *Johnson*, 53 Va. App. at 95. A trial court can also consider "evidence of a defendant's irrational behavior[ and] his demeanor at trial." *Id.* at 92 (quoting *Drope*, 420 U.S. at 180); *see also id.* at 92 n.2 (holding that "bizarre . . . and irrational behavior[, without more,] can[not] be equated with mental incompetence to stand trial" (quoting *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995))). These "first-hand interactions with, and observations of, the defendant and [his] attorney[]" place the trial court in a "be[tter] position [than the appellate court] to make [a] competency determination[]." *Dang*, 287 Va. at 150 (quoting *United States v. Bernard*, 708 F.3d 583, 593 (4th Cir. 2013)). And in the totality-of-the-circumstances calculus, the court may consider a claim of incompetency that arises after trial has already begun with skepticism. *See id.* at 153 (holding that a court could properly *consider* "the timing of [a competency] motion" made on the eve of trial as long as its "*focus*[ was] on the question of [the defendant's] competency [at] trial" (emphasis added)).

Here, after the trial court began the plea colloquy, it paused to ask Wilson, "Are you okay? You look like you're not feeling well." Wilson reported a "terrible headache" and said he had not received his "depression" medication the previous night. The court asked if he was hunched over because it alleviated his symptoms. Wilson replied that he had hurt his back in a car accident. The judge allowed him to remain seated but asked him to look up at her instead of at the table and proceeded to conduct the colloquy. Wilson answered that he understood the

- 6 -

charge, his plea, the Commonwealth's burden, and his right to remain silent. He said he was ready for trial but volunteered, "I haven't broken the law."

The court empaneled the jury. Outside the jury's presence, the court noted that it had summoned a nurse from the jail due to Wilson's demeanor. The nurse said she could not give him what the court called his "psych medicine" "because they're nighttime medicines." She also noted that he was refusing Tylenol and she had not seen him "displaying th[e] hunched-over behavior" in her prior interactions with him. Wilson reported that he was allergic to Tylenol and did not know whether he could take Advil. Wilson declined the trial court's "last o[ffer] to summon medical [staff] to bring [him] something."

Counsel then asked for time to speak privately with Wilson "to ascertain that [his] client c[ould] communicate with [him]." After twenty minutes, the court asked if any issue arose at the pretrial hearing the previous week. The prosecutor noted that Wilson had "come out with the whole neck thing on Friday" with "something white around his neck." Defense counsel expressed his present "concerns" about Wilson's ability to "communicate with [counsel] about what the witnesses [would be] saying against him" and "to assist in his own defense." The court stated it was "fairly confident that [Wilson wa]s malingering" and had "deci[ded] to act this way." It noted he had not "been this way before," was "not like this at the jail," and had "been refusing medication." *See Grattan*, 278 Va. at 618 (considering testimony about the defendant's conduct while in jail).

Defense counsel made a formal motion for a competency evaluation, expressing "severe concerns" that with Wilson "acting in this ma[nn]er," they had not been able to confer during voir dire and Wilson could not react to adverse witness testimony at trial. In doing so, counsel acknowledged that the behavior causing him concern arose before the jury was sworn, yet he waited until afterward to conduct further investigation and make a formal motion. The court

asked Wilson directly, "[W]hy are you acting this way?"  Wilson plainly replied, "Because I didn't do this."  When asked why he was hunched over, he blamed his "car-accident problem," said he didn't take the Tylenol offered because he was "allergic," and suggested he did not take his medicine the night before because "[s]he didn't call [his] name."  The trial court denied the motion for a competency evaluation.

After opening statements, outside the presence of the jury, defense counsel pointed to the prosecutor's comment during opening that "Wilson [wa]s hunched over with his chin against his chest and not making eye contact with anybody."  Counsel argued that Wilson's conduct, which the prosecutor highlighted for the jury, was evidence that he could not assist in his defense.  The court posed a hypothetical, asking, "If for the sake of argument a defendant, who is nervous about going to a jury trial for second-degree murder, volitionally opts to refuse medication and, by doing so, potentially puts himself in a compromised state of psychiatric readiness, what should the [c]ourt's response to your motion be . . . ?"  Defense counsel replied that restoration services would be required in that situation.  When the court asked why a competency evaluation had not been requested at the pretrial hearing, defense counsel answered that the hearing lasted only about twenty seconds and he did not "know how bad [Wilson] was going to be [at trial]."  After the prosecutor noted that Wilson had reported when arrested that he was schizophrenic, defense counsel replied that his practice was not to move for an evaluation until behavior "affect[ed] the relationship between counsel and his client" because "even a schizophrenic person c[ould] be aware of the nature of the proceedings against [him] and assist in [his] own defense."  Counsel represented that Wilson was assisting until just a few days before trial but his behavior had started so "severely affecting the [attorney-client] relationship" that counsel "ha[d] to make th[e] motion."

The court denied the renewed motion, stating it did not "think neck and back pain [provided] cause for adjourning a 15-witness murder trial for a competency evaluation." It further noted that jail medical staff reported Wilson had "not tak[en] his psychiatric medication for the [previous] three nights." As a result, it concluded that Wilson "brought [the issue] on" himself. The court ruled that the trial would continue.[4]

At no point did defense counsel provide a "*detailed proffer*" about Wilson's "mental state sufficient to satisfy the probable cause standard." *See Clark*, 73 Va. App. at 708 (emphasis added). The only "proffers" were statements of *concern* about Wilson's ability to assist and communicate, with no specific evidence that he was unable, rather than simply unwilling, to do so.[5] And "nothing in the statutory competency standard requires a defendant to actually assist . . . in his defense." *Grattan*, 278 Va. at 618-19 (citing Code § 19.2-169.1(E)). Instead, "it merely requires that [he] have the *ability* to do so." *Id.* at 619.

The trial court was entitled to give greater weight to its colloquy with Wilson, which showed his understanding of the proceedings and his ability to communicate, despite his reported physical pain. It also had the benefit of Wilson's own statement that his failure to confer with counsel during voir dire, which counsel thought meant that he also would not react to the testimony of the witnesses against him, was volitional behavior resulting from Wilson's contention that he did not commit the charged crime. The trial judge, as the judge closest to the

---

[4] When the trial court made its final ruling on the first day of trial, it described Wilson's ongoing hunched-over behavior. On the second day, it found that "he [wa]s sitting up straight," was "actively . . . paying attention," and "d[id] not seem off." It reiterated its initial finding that his behavior "had in part to do with his own refusal of medication" and "didn't affect his competency if it was neck and back pain." The court opined that its "finding . . . that there wasn't sufficient reason to adjourn th[e] trial . . . and [cause] delay . . . seem[ed] to have been confirmed."

[5] The judge, not defense counsel, initiated the inquiry into Wilson's behavior. In response to questions, Wilson identified physical pain from a previous injury, missing a dose of medication, and the fact that he "didn't do this" as bases for his behavior.

issue, therefore concluded that Wilson did not establish that his competency was in question. Instead, the court found that his failure to take his medication "brought on" his neck and back pain and that the impact of this pain was insufficient to require a competency evaluation. It did not abuse its discretion by focusing on his personal explanation for his observable behavior and his ability to proceed rather than on counsel's nonspecific suggestions relating to competency. *Cf. Dang*, 287 Va. at 149, 152 (holding the evidence supported the theory that the defendant's changed behavior at trial mirrored his pretrial "tendency to shift focus to . . . explain 'his side of the story'" and "was a symptom of situational anxiety[,] not incompetence"). We therefore affirm the denial of the motion for a competency evaluation.[6]

## II.  Recorded 911 Calls

Wilson argues that the contents of the two telephone calls made to 911 operators by hotel employees Hickson and Triba, witnesses at trial, were hearsay and were not admissible for their truth under the hearsay exceptions advanced by the prosecutor.[7]  The Commonwealth contends that Wilson waived this objection.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause

---

[6] Based on the denial of the motion for a competency evaluation, Wilson made a motion for a mistrial, which the court also denied.  Wilson argues on appeal that the court's "primary concern" in denying the competency evaluation was to avoid "having to declare a mistrial regardless of [his] apparent mental difficulties."  Wilson does not, however, develop this mistrial argument on brief or provide authority for it, so we do not consider it.  *See* Rule 5A:20(e); *Jay v. Commonwealth*, 275 Va. 510, 519-20 (2008) (permitting an appellate court to treat an assertion for which the appellant does not present legal authority as waived if that failure is significant); *see also Doe v. Green*, ___ Va. ___, ___ & n.8 (Nov. 26, 2025) (recognizing that "an appellant's failure to raise a specific argument in her opening brief" and to cite supporting authorities results in a waiver of that argument under both Rule 5:27(d) in the Supreme Court and Rule 5A:20(e) in the Court of Appeals).

[7] At trial, Wilson contested the admission of both the contents of the two 911 calls and the recordings themselves.  On appeal, he challenges only the admission of the contents of the calls.

shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of the contemporaneous objection [requirement in this] rule is to alert opposing counsel to the issue and to provide the trial court an opportunity to intelligently rule on the issue." *Commonwealth v. Carolino*, 303 Va. 399, 409 (2024). To meet this goal, an objection "must be both *specific* and *timely*—so that the trial judge w[ill] know the particular point being made in time to do something about it." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019) (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). And "neither an appellant nor an appellate court should 'put a different twist on a question that is at odds with the question presented to the trial court.'" *Id.* at 744 (quoting *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999)).

With regard to the contents of Hickson's 911 call, the prosecutor asserted at trial that two hearsay exceptions rendered the call admissible for its truth—the excited-utterance and present-sense-impression exceptions. Wilson briefly addressed the excited-utterance exception, stating that it did not apply "because [the witness] called 911[, s]o there was time for reflection."[8] However, counsel did not mention the present-sense-impression exception or suggest that it was inapplicable. And the trial court expressly ruled that both hearsay exceptions supported admitting the contents of Hickson's 911 call.

The excited-utterance and present-sense-impression exceptions are related in that both "involve words . . . accompanying an incident [that] serve to explain that incident." *Gelber v. Glock*, 293 Va. 497, 511 n.8 (2017) (quoting Charles E. Friend & Kent Sinclair, *The Law of Evidence in Virginia* § 15-17, at 991 (7th ed. 2012)). Both also require a threshold amount of "[s]pontaneity, which . . . serves as the guarantee of trustworthiness." *Arnold v. Commonwealth*,

---

[8] He also alleged that the contents were improper bolstering and irrelevant. When the prosecutor later moved to admit the recordings themselves, she again relied on a hearsay exception. Wilson replied, "Let's back out of the hearsay thing because I don't think that's actually the real issue here," and he repeated his earlier argument that the recordings were inadmissible "bolstering statement[s]."

4 Va. App. 275, 281 (1987); *see Foley v. Commonwealth*, 8 Va. App. 149, 163-64, *adopted on reh'g en banc*, 9 Va. App. 175 (1989). But the excited-utterance exception in Virginia Rule of Evidence 2:803(2) requires a "startling event or condition," and the present-sense-impression exception in Rule 2:803(1) does not.[9] The excited-utterance exception, although related to the present-sense-impression exception, is a different exception embodied in a different subsection of Rule 2:803.

As a result, under Rule 5A:18, Wilson preserved only his excited-utterance hearsay objection to the admission of the contents of Hickson's 911 call, and he waived his objection to the court's application of the present-sense-impression exception.[10] This is so because when "'one or more alternative holdings [support] an issue,' the appellant's 'failure to address one of the holdings results in a waiver of any claim of error with respect to the court's decision on that issue.'" *Johnson v. Commonwealth*, 45 Va. App. 113, 116 (2005) (quoting *United States v. Hatchett*, 245 F.3d 625, 644-45 (7th Cir. 2001)), *quoted with approval in Neff v. Commonwealth*, 63 Va. App. 413, 416 n.3 (2014). "[T]o hold otherwise[] [would allow] 'an appellant [to] avoid the adverse effect of a separate and independent basis for the judgment by ignoring it and leaving it unchallenged.'" *Id.* at 116-17 (quoting *San Antonio Press v. Custom Bilt Mach.*, 852 S.W.2d 64, 65 (Tex. App. 1993)); *see Rankin v. Commonwealth*, 297 Va. 199, 202 (2019) (per curiam). Here, Wilson preserved only his excited-utterance objection to the contents of Hickson's 911 call. Accordingly, the trial court's present-sense-impression ruling—a legally viable

---

[9] The Virginia Rules of Evidence appear in Part 2 of the Rules of the Supreme Court of Virginia. Although we refer to them as the Virginia Rules of Evidence, this Court's longstanding practice with regard to most other parts of the Supreme Court's Rules—such as those in Part 5A, which relate exclusively to appeals in this Court—is simply to cite the rule number without additional reference.

[10] Rule 5A:18 contains both a good-cause and ends-of-justice exception. But Wilson does not contend that either exception applies, and this Court does not raise those exceptions sua sponte. *See* Rule 5A:18; *Jones v. Commonwealth*, 71 Va. App. 597, 607 n.9 (2020).

- 12 -

"freestanding basis" for admitting hearsay evidence—remains unchallenged and supports the admission of the contents of Hickson's 911 call. *See Johnson*, 45 Va. App. at 117. For this reason, Wilson waived his right to contest the admission of the contents of that 911 call on appeal.

With regard to the contents of Triba's 911 call, Wilson objected on relevance grounds because Triba "already testified as to what he said" on the call. The prosecutor asserted that the contents of the call were relevant and admissible under the present-sense-impression hearsay exception. The court overruled Wilson's objection, stating that the contents of the recording were relevant and it was "mak[ing] the same ruling" as before, presumably referring to its conclusion that the contents of Hickson's 911 call were admissible under at least the present-sense-impression hearsay exception. The court and defense counsel then discussed whether the contents of Triba's call were hearsay at all. The court opined that at least some of the statements were not offered for their truth, and defense counsel argued they were "all hearsay" and "double hearsay." At no point during that discussion, however, did defense counsel mention either hearsay exception or attempt to rebut the prosecutor's argument, adopted by the trial court, that a hearsay exception justified admitting the contents of Triba's call.[11]

Consequently, we hold that Wilson waived his right to have this Court review the trial court's rulings admitting the contents of the two challenged 911 calls.[12]

---

[11] Once again, Wilson does not contend that either exception to Rule 5A:18 applies. As a result, we will not consider the exceptions. *See* Rule 5A:18; *Jones*, 71 Va. App. at 607 n.9.

[12] Appellate courts must decide cases on the best and narrowest ground. *See Commonwealth v. Kartozia*, 304 Va. 321, 336 n.* (2025). We therefore do not consider the Commonwealth's argument that the approbate-and-reprobate doctrine serves as a procedural bar to this assignment of error. For the same reason, we do not consider whether any error in admitting the contents of the 911 recordings was harmless because the contents were merely cumulative of other, properly admitted evidence or the evidence of guilt was overwhelming.

- 13 -

III. Sufficiency of the Evidence to Prove Identity

Wilson argues the trial court erred by denying his motion to strike, contending the evidence was insufficient to prove that he was the person who fatally stabbed Mata-Monjaras.

"When an appellate court reviews the sufficiency of the evidence underlying a criminal conviction, its role is a limited one." *Commonwealth v. Garrick*, 303 Va. 176, 182 (2024). "[T]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Sample v. Commonwealth*, 303 Va. 2, 16 (2024) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). Appellate review "does not distinguish between direct and circumstantial evidence, as the fact finder itself 'is entitled to consider all of the evidence, without distinction, in reaching its determination.'" *Garrick*, 303 Va. at 183 (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

It is axiomatic that at trial, "the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Shahan v. Commonwealth*, 76 Va. App. 246, 258 (2022) (quoting *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013)); *see Sample*, 303 Va. at 17. On appeal, we review the trier of fact's determination about the identity of the criminal actor in the context of "the totality of the circumstances." *Brown v. Commonwealth*, 37 Va. App. 507, 523 (2002) (quoting *Satcher v. Commonwealth*, 244 Va. 220, 249 (1992)). Identity, like any element of a crime, can be proved using circumstantial evidence such as a defendant's statements and conduct. *See Alston v. Commonwealth*, 77 Va. App. 639, 648 (2023); *Crawley v. Commonwealth*, 29 Va. App. 372, 375 (1999). "Indeed, in some cases

- 14 -

circumstantial evidence may be the only type of evidence [that] can possibly be produced." *Stamper v. Commonwealth*, 220 Va. 260, 272 (1979).

Significantly, though, "[c]ircumstantial evidence is not 'viewed in isolation' because the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable [fact finder]' to conclude beyond a reasonable doubt that a defendant is guilty." *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (second alteration in original) (quoting *Muhammad v. Commonwealth*, 269 Va. 451, 479 (2005)). "[It] is competent and is entitled to as much weight as direct evidence provided that the . . . evidence [as a whole] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Walker v. Commonwealth*, 79 Va. App. 737, 743-44 (2024) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). And "[w]hether an alternate hypothesis of innocence is reasonable is a question of fact[, the resolution of which] is binding on appeal unless plainly wrong." *Fary v. Commonwealth*, 77 Va. App. 331, 344 (2023) (en banc) (quoting *Lucas v. Commonwealth*, 75 Va. App. 334, 348 (2022)), *aff'd*, 303 Va. 1 (2024).

Here, the evidence, viewed under the proper standard, supports the jury's finding that Wilson was the person who fatally stabbed Mata-Monjaras. Hotel employees Triba, Hickson, and Taylor confirmed Wilson's presence on hotel property in the hours and minutes leading up to the stabbing, based on either firsthand observation or identification in hotel surveillance video. During police questioning, Wilson, too, identified himself in hotel surveillance video from just before the attack. Mercedes never wavered in identifying Wilson as the person she and her husband encountered seconds before Mata-Monjaras was stabbed.[13] She said that when they spoke to Wilson, light from the hotel was shining on his face, he was holding his hand behind his

_____

[13] On appeal, Wilson does not contest Mercedes's identification of him as being "in the immediate vicinity . . . before the fatal stabbing."

back, and he was the only other person in the area. And as soon as she saw her husband on the ground bleeding, she spotted Wilson running away.

Mercedes's testimony alone is sufficient to establish Wilson as the only person who had the opportunity to stab her husband. Her inability to see a weapon while Wilson held his hand behind his back was an additional circumstance for the jury to consider along with the other evidence. That evidence included the fact that just moments before the stabbing, Hickson saw Wilson carrying a large knife, described as either a "butcher knife" or a "machete," which Taylor identified as visible in Wilson's hand in several contemporaneous video recordings. *See Barney*, 302 Va. at 97. The medical examiner testified that "[t]he stab wound had a blunt side and a sharp side," and went completely through Mata-Monjaras's torso, consistent with the shape and size of the weapon the witnesses observed. *See id.*

Wilson's flight immediately after Mata-Monjaras called out to Mercedes was additional evidence of his guilt. The trial court correctly instructed the jury "that if a person leaves the place where a crime was committed to avoid . . . apprehension, . . . this creates no presumption" of guilt but is nonetheless "a circumstance" the jury can consider. *See Cheripka v. Commonwealth*, 78 Va. App. 480, 503 (2023). So the jury was free to weigh Wilson's flight in determining his guilt.

Lastly, despite Wilson's suggestion that someone else could have committed the crime, any hypothesis of innocence must "flow from the evidence itself[] and not from the imagination[] of defense counsel." *Commonwealth v. Wilkerson*, 304 Va. 92, 102 (2025) (quoting *Cook v. Commonwealth*, 226 Va. 427, 433 (1983)). No evidence suggested any cause for the fatal wound other than an attack by Wilson, who had the means to inflict the wound with the knife he was carrying, was the only person Mercedes saw in the vicinity at the time of the

stabbing, and fled right after the wound was inflicted. We conclude based on this record that the trial court did not err in denying Wilson's motion to strike.

CONCLUSION

We hold that the trial court did not abuse its discretion by denying his post-jury-selection motion for a competency evaluation, admitting the contents of recordings of two 911 calls, and concluding the evidence was sufficient to prove that Wilson was the person who committed the charged offense. Consequently, Wilson's conviction for second-degree murder is affirmed.

*Affirmed.*